FILED
2016 May-18  AM 10:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| STEPHEN WOOD, and KAYE WOOD, | ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 7:14-cv-01685-LSC |
| | ) | |
| GREEN TREE SERVICING LLC, | ) ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

Before the Court is a motion for summary judgment filed by Defendant Green Tree Servicing, LLC ("Green Tree"). Plaintiffs Stephen and Kaye Wood (the "Woods") filed this suit making breach of contract, negligent and wanton loan servicing, negligent hiring, defamation, and Real Estate Settlement Procedures Act ("RESPA"), 27 U.S.C. §§ 2601–2617, claims. These claims largely stem from insurance proceeds that the Woods received after their house burned down. They sent these proceeds to GMAC Mortgage LLC ("GMAC"), who was servicing their home mortgage at the time, but GMAC—and later Green Tree when it was servicing the mortgage—never applied the insurance proceeds to the Woods' account. In addition to moving for summary judgment, Green Tree asks the Court to declare that the Woods owe money on their loan.

## I.    BACKGROUND

The Woods purchased the property at issue in this case in 2004 without financing. They later constructed a barn, pool, and shed, and they paved a road on the property. To finance these improvements, the Woods executed a $150,000 promissory note and mortgage in June 2006 in favor of GMAC. In 2009, the Woods experienced financial difficulties and got behind on some of their mortgage payments. As a result, the Woods and GMAC entered into a loan modification agreement. However, the Woods continued to miss mortgage payments even after the loan modification.

In February 2011, the Woods' house burned down. They made a claim for fire damage with their insurer, Cotton States Insurance Company. Cotton States issued a check for $152,800 jointly payable to the Woods and GMAC. The Woods endorsed the check and sent it to GMAC in July 2011. After sending the check, the Woods sent letters to GMAC contending that the insurance proceeds were in excess of the remaining loan balance and demanded that they fully satisfy the loan. The Woods did not send any more payments to GMAC or Green Tree, who started servicing the loan in February 2013.

The mortgage agreement provided express options for how insurance proceeds would be used. Specifically, the mortgage agreement states, "Unless

Lender and Borrower otherwise agree in writing, any insurance proceeds . . . shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened." In the same section, the mortgage agreement states, "If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due . . . ." (Doc. 36-1 at 6). After the fire, the Woods did not rebuild their house or otherwise attempt to restore it. They claim that it would not have been economically feasible because an estimate they solicited stated that a rebuild would cost around $260,000, although they did not provide this estimate to GMAC or Green Tree. Because they did not rebuild, Green Tree did not dispense the funds to cover any repair or restoration costs. Nor did Green Tree apply the insurance proceeds to the balance of the loan. Instead, Green Tree placed the funds in an escrow account.

In late 2012, GMAC sent various letters to the Woods notifying them that the insurance proceeds were not sufficient to satisfy the entire loan, that their payments were past due, and that their account was referred to foreclosure. The Woods again sent letters demanding that the insurance proceeds satisfy the full loan amount, and in at least one phone conversation, they stated their belief that

over $10,000 of the proceeds should be returned to them after satisfying the loan amount.

In June 2013, Green Tree accelerated the maturity of the loan balance and referred their account to foreclosure counsel. The Woods' account was in foreclosure for over a year, although it appears that Green Tree did not invoke its right to sell the property. The mortgage agreement provided that after acceleration but before Green Tree sold the property, the Woods could reinstate their mortgage if they met four conditions:

> (a) pay[] Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure[] any default of any other covenants or agreements; (c) pay[] all expenses incurred in enforcing this Security Instrument, including but not limited to reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; (d) take[] such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument . . . .

(Doc. 36-1 at 11). In June 2014, Green Tree sent a letter to the Woods that stated that the reinstatement amount was $56,452.77. At that time, and at all other times while the Woods' account was in foreclosure, Green Tree was still holding the insurance proceeds. However, the Woods did not specifically ask to reinstate their loan using these funds, and Green Tree never reinstated the loan.

On December 31, 2013, Green Tree sent a letter in response to a correspondence sent by the Woods. (Doc. 36-11 at 1). In the letter, Green Tree reiterated that the insurance proceeds were insufficient to pay off the full loan amount and that the proceeds were being held in an escrow account in accordance with Fannie Mae guidelines until foreclosure was completed. *Id.* A few months later, in March 2014, the Woods' attorneys sent a letter, styled as a qualified written request, requesting four pieces of information: (1) all mortgage documents, (2) a history of the insurance proceeds check, (3) information on whether the check was held in an interest bearing account, and (4) a complete payment history on the Woods account. (Doc. 37-8 at 2). The letter additionally stated that the Woods believed that the insurance proceeds should have fully satisfied the mortgage. However, the letter did not frame this belief as a request for information or a notice of error. Green Tree responded to this letter, providing the requested information and again stating that the insurance proceeds were not sufficient to pay off the loan, as the balance was over $161,000.

In August 2014, the Woods' attorneys sent another letter, styled as a qualified written request, that had four notices of error and three requests for information: (1) notice of error: the insurance proceeds should have been applied to the Woods' account; (2) notice of error: charging late fees and other fees to the

Woods' account was an error; (3) notice of error: force placing insurance on the Woods' account was an error; (4) notice of error: commencing foreclosure was wrongful; (5) request for information: identify the regulations requiring the insurance proceeds be held in escrow; (6) request for information: identify the owner and any investor in the loan; and (7) request for information: identify any all steps taken to ensure that the loan was serviced properly. The Woods stated that they did not draft the letter themselves, that they did not know the letter was sent, and that they otherwise had no knowledge of the letter's existence. Rather, their attorney drafted and sent the letter without specifically informing them about it.

The Woods' attorney at the time swore in an affidavit that she mailed the letter on August 27, 2014 to P.O. Box 6176 Rapid City, South Dakota 57709-617. The Woods additionally provided tracking information showing that the letter was delivered on September 5, 2014. Green Tree does not dispute that the letter was sent to this address or that this was the proper address. However, Green Tree's corporate representative denied receiving this letter, stating that it was not in the Woods' loan file. Accordingly, Green Tree never responded to this letter.

On April 10, 2015, Green Tree retroactively applied the insurance proceeds to the Woods' account. Even after this, the Woods still had an unpaid principal

balance of $12,110.63. The parties have not, however, stated how much the Woods might owe in interest and fees.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The trial judge should not weigh the evidence but must simply determine where there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Services, LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact

necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

The Woods' Complaint alleges seven counts, including claims based on breach of contract, RESPA, negligent loan servicing, wanton loan servicing, negligent hiring, and defamation. However, in the response to Green Tree's motion for summary judgment, the Woods conceded their negligent and wanton loan servicing, negligent hiring, and defamation claims. Therefore, those claims are dismissed, and the only remaining claims are the breach of contract and RESPA claims.

### A.    Breach of Contract

The Woods allege that Green Tree breached their mortgage agreement in two different ways. First, they allege that Green Tree failed to apply the insurance proceeds to their account as required by the contract. Second, the Woods allege that Green Tree commenced foreclosure proceedings when they should have reinstated the mortgage agreement. The elements of a breach of contract claim are

"(1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002). The parties do not dispute that they were in a contractual relationship. Rather, they dispute the performance or nonperformance of both the Woods and Green Tree.

### 1. Failure to Apply Insurance Funds

After the Woods sent GMAC the insurance proceeds they received after their house burned, GMAC, and later Green Tree, did not apply those proceeds to the Woods' account. Rather, they placed the proceeds in an escrow account, purportedly "in accordance with Fannie Mae guidelines."[1] (Doc. 34 at 17). However, the mortgage agreement was clear about how Green Tree was to use the insurance proceeds. First, if economically feasible, Green Tree would dispense the funds to pay for the restoration or repair of the property. Second, "[i]f the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower."[2] (Doc. 36-1 at 6–7). The parties do not dispute that the Woods did not

---

[1] Green Tree has not provided the Fannie Mae guidelines to the Court, and it has not shown how those guidelines bind the parties.

[2] Although the mortgage agreement initially says, "Unless Lender and Borrower otherwise agree in writing, any insurance proceeds . . . shall be applied to restoration or repair of the Property," it

attempt repairs of their house. Instead, they dispute whether restoration or repair was economically feasible. The Woods cite a $260,000 repair estimate, arguing that rebuilding their house would have cost over $100,000 more than the insurance proceeds. Although Green Tree does not specifically argue that restoration was economically infeasible, it states that the Woods never provided them with the $260,000 estimate. Thus, Green Tree had no way to determine if the estimate was reasonable or even if it estimated rebuilding a comparable home. As such, Green Tree is unwilling to concede that repair or restoration was not economically feasible—resulting in a genuine dispute of material fact.

Green Tree additionally argues that the Woods never sought to have the insurance proceeds applied to the loan balance, but instead sought to have the insurance proceeds fully satisfy the loan. This argument, however, is inconsistent. The Woods always wanted to have the insurance proceeds applied to the loan balance. Perhaps, they were mistaken about what the loan balance was and, as a result, sought full satisfaction; yet they undisputedly indicated how they wanted the insurance proceeds applied.

---

later affirmatively states that "[i]f restoration or repair is not economically feasible . . . the insurance proceeds shall be applied to the sums secured by this instrument." (Doc. 36-1 at 6). Thus, the mortgage agreement appears to remove the writing requirement when applying the insurance proceeds to the loan balance—requiring it only for other uses of the proceeds.

Moreover, Green Tree argues that it did not apply the proceeds to the Woods' account in order to avoid having the check serve as an accord and satisfaction. "An accord and satisfaction is an agreement reached between competent parties regarding payment of a debt the amount of which is in dispute." *Leisure Am. Resorts, Inc. v. Carbine Constr. Co.*, 577 So. 2d 409, 411 (Ala. 1990). In other words, if Green Tree agreed to accept the insurance proceeds in full satisfaction of the loan, then the parties would have reached an accord and satisfaction.

After sending the insurance proceeds to GMAC, the Woods sent letters to GMAC stating that the proceeds were enough to pay off the whole mortgage and that they were due any excess. Green Tree presumably believed that applying the proceeds to the Woods' account would act as an implied agreement to accept the proceeds as an accord and satisfaction. However, as with any contract, a meeting of the minds is required for a valid accord and satisfaction. *See Leisure Am. Resorts, Inc. v. Carbine Constr. Co.*, 577 So. 2d 409, 411 (Ala. 1990) ("Like any other contract, a valid accord and satisfaction requires consideration and a meeting of the minds regarding the subject matter."). Neither party disputes that Green Tree did not agree to treat the insurance proceeds as an accord and satisfaction of the note and mortgage. In fact, Green Tree sent letters to the Woods informing them that

the insurance proceeds did not satisfy the note and mortgage. (Docs. 36-11, 36-14). Although Green Tree feared that the Woods might sue claiming an accord and satisfaction, it has not cited any legal authority saying that fear of litigation allowed them to hold the insurance proceeds.

Additionally, Green Tree argues that the Woods' failure to perform all of their obligations prevents them from claiming breach of contract. Generally, "a party to a contract who has caused a failure of performance by the other party cannot take advantage of that failure." *Dixson v. C. & G. Excavating, Inc.*, 364 So. 2d 1160, 1162 (Ala. 1978). Here, the Woods do not dispute that they failed to make all of their mortgage payments. Although that is a breach of the mortgage agreement, the failure to make payments did not cause Green Tree's potential breach in not applying the insurance proceeds. In fact, the Woods did perform their obligation to send any insurance proceeds to GMAC, creating a reciprocal obligation to perform with respect to those proceeds.

### 2.      Reinstatement

The Woods additionally allege that Green Tree breached the mortgage by starting the foreclosure process instead of reinstating the mortgage agreement. The mortgage agreement gave the Woods the right to reinstate the terms of the mortgage and avoid acceleration and foreclosure. Specifically, it states, "If

Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time . . . ." (Doc. 36-1 at 11). Those conditions were that the Woods:

> (a) pay[] Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cure[] any default of any other covenants or agreements; (c) pay[] all expenses incurred in enforcing this Security Instrument, including but not limited to reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; (d) take[] such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument . . . .

(Doc. 36-1 at 11).

The undisputed facts show that the insurance proceeds, which Green Tree was holding, were more than sufficient to meet condition (a). Green Tree has not argued that the Woods failed to meet the other conditions. Instead, they argue that the Woods waived their right to reinstatement because they never expressly asked Green Tree to reinstate their loan. However, Green Tree has not shown where the mortgage agreement contains an implied condition requiring the Woods to notify Green Tree that they wanted to reinstate the loan, in addition to the four specified

conditions.[3]

Alabama law does allow courts to imply notice requirements in certain scenarios. *See Cochrane Roofing & Metal Co. v. Callahan*, 472 So. 2d 1005, 1007–1008 (Ala. 1985). Specifically, "when a party to a contract assumes an express obligation to do certain things . . . *the law implies a corresponding obligation on the other party to allow him all reasonable opportunity to perform*. The cooperation may be, as in the instant case, the giving of timely notice." *Id.* at 1008 (emphasis in original). However, Green Tree did not make that argument, and the Court will not assume what obligations reinstatement imposes on Green Tree and what actions by the Woods would allow Green Tree to perform those obligations. Accordingly, the Court will, at this point, only look at the four express conditions in the mortgage agreement, which Green Tree has not argued that the Woods did not perform. Thus, Green Tree's motion for summary judgment is denied as to this claim.

### B.   RESPA

The Woods additionally claim that Green Tree violated RESPA by failing to respond to their August 27, 2014 letter. RESPA is a consumer protection statute aimed, in part, at providing "greater and more timely information on the nature

---

[3] Perhaps, condition (d) impliedly required the Woods to communicate with Green Tree to ascertain what other conditions they might require. However, Green Tree did not make that argument and has not shown that the Woods failed to meet that condition.

and costs of the [residential real estate] settlement processes." 12 U.S.C. § 2601. To that end, RESPA requires a loan servicer to take certain actions when a borrower sends it a qualified written request ("QWR"). A QWR is a written correspondence, other than a payment coupon, that identifies the name and account of the borrower and has a statement of why the borrower believes his account is in error or a statement of information sought. *See id.* at §2605(e)(1)(B). When a loan servicer receives a QWR from a borrower, RESPA requires that the loan servicer provide a written response acknowledging receipt within five days. *See id.* at § 2605(e)(1)(A). Within thirty days of receiving the QWR, a loan servicer is additionally required to (1) make the appropriate corrections in the borrower's account, (2) provide an explanation on why the loan servicer believes the borrower's account is correct, or (3) provide the information requested by the borrower. *See id. at* § 2605(e)(2).

However, regulations promulgated by the Bureau of Consumer Financial Protection provide that a loan servicer does not have to respond to a duplicative QWR. *See* 12 C.F.R. § 1024.35(g).   If "[t]he asserted error [in a QWR] is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied with its obligation to respond," then the loan servicer does not have to respond to the errors or request for information. *Id.*

However, the loan servicer must respond if the QWR contains "new and material information to support the asserted error." *Id.* Additionally, the loan servicer must provide notice that it is not required to comply with the response requirements and state the reasons for not responding to the substance of the QWR. *See id.* at § 1025.35(h).

If a loan servicer fails to timely and adequately respond to a QWR or make appropriate corrections, it may be liable for the "sum of any actual damages to the borrower as a result of the failure . . ." 12 U.S.C. § 2605(f)(1)(A). Here, the parties have not disputed whether Green Tree is a loan servicer subject to RESPA, and they do not appear to dispute that the August 27, 2014 letter was a QWR. Rather, Green Tree argues that it never received the QWR from the Woods, that the QWR was duplicative, and further that the Woods have not shown that they have incurred damages.

### 1.      Receipt of QWR

Neither RESPA nor its accompanying regulations define what constitutes receipt of a QWR. However, in other contexts, the Eleventh Circuit has found that a "'presumption of receipt' arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail." *Konst v. Florida East Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996) ("The common law has long

recognized a rebuttable presumption that an item properly mailed was received by the addressee."). This presumption is, of course, rebuttable by the party claiming it did not receive a correspondence. *See id.* The Court sees no reason why this presumption should not apply in this context, but even if it does not, the parties have presented facts sufficient to create a genuine dispute of material fact.

The Woods have provided evidence showing that they properly addressed and mailed the August 27, 2014 QWR. The attorney representing the Woods at the time swore in an affidavit that she properly addressed and mailed via certified mail a letter to Green Tree at P.O. Box 6176, Rapid City, South Dakota 57709-6176. (Doc. 37-11 at 11). The Woods also provided the tracking information showing the QWR was delivered and a signature indicating receipt. (Doc. 37-11 at 9–11). Although the QWR itself is undated, the tracking information and signature show it was delivered on September 5, 2014. These undisputed facts are sufficient to create a presumption of receipt.

Green Tree does not dispute that the Woods sent the QWR to the correct address. Rather, they dispute whether they actually received it at their office, noting that the tracking and signature do not show that the QWR was actually delivered to the correct mailbox. Additionally, Green Tree's Vice President of Collections testified in his deposition that Green Tree did not have any record of

receiving the Woods' QWR. This testimony is enough to dispute whether Green Tree received the QWR, resulting in a genuine issue of material fact.

### 2.    Duplicative

Although Green Tree argues that the August 27, 2014 QWR was duplicative, Green Tree was still required to respond to the Woods telling them that the QWR was duplicative and did not require a response. *See* 12 C.F.R. § 1025.35(h). However, in any case, the August 27, 2014 QWR was not duplicative. The first notice of error in the August 27, 2014 QWR asked that Green Tree apply the insurance proceeds to the Woods' mortgage. Importantly, this QWR did not ask Green Tree to apply the insurance proceeds in full satisfaction of the loan—which their previous correspondences did and which Green Tree responded to. The difference between applying the insurance proceeds to sums owed and applying them in full satisfaction is material. Green Tree could have complied with what the Woods asked for in the August 27, 2014 notice of error and maintained the position that the Woods still owed money on the loan. However, Green Tree arguably could not have maintained that position if it responded to the Woods' previous requests to apply the proceeds in full satisfaction of the loan. In fact, Green Tree went to great lengths to notify the Woods that the insurance proceeds did not fully satisfy the loan, and it has gone to great lengths in this motion to differentiate between

applying the insurance proceeds and accepting an accord and satisfaction. Thus, because this notice of error in the August 27, 2014 QWR raised a new and material issue, it was not duplicative.

The second notice of error asked that Green Tree remove late fees or other fees applied to the Woods' account. The third notice of error asked Green Tree to reverse all charges for force-placed insurance, and the fourth notice of error asked Green Tree to print a retraction of the foreclosure notice. These last three notices of error were never addressed in previous responses by Green Tree. Perhaps, the late fees, force-placed insurance, and foreclosure were all the result of Green Tree not applying the insurance proceeds to the Woods' account. However, Green Tree has not shown how its previous responses sufficiently addressed these issues.

Additionally, the August 27, 2014 QWR requested information regarding (1) the regulations requiring the insurance proceeds to be held in escrow, (2) the owner and any investor in the loan, and (3) any and all steps taken to ensure that the loan had been serviced properly by Green Tree. Green Tree did previously identify Fannie Mae as the owner of the loan. (Doc. 36-11 at 1). However, none of Green Tree's other previous correspondences included information relating to the other topics. As a result, the August 27, 2014 QWR was not wholly duplicative, and

Green Tree was required to respond to the QWR or make the appropriate corrections.

### 3.    Damages

Finally, Defendants argue that the Woods have failed to prove that they suffered damages. A servicer who fails to respond to a borrower's QWR under § 2605 is only liable for "any actual damages to the borrower as a result of the failure." § 2605(f)(1)(A). The term "actual damages" is not defined in the statute. However, RESPA is a consumer protection statute, and courts have generally construed consumer protection statutes liberally. *See Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998) (construing the Truth in Lending Act liberally); *Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002) ("Like the TILA, the [Consumer Leasing Act] is a consumer protection statute which 'is remedial in nature and therefore must be construed liberally in order to best serve Congress' intent.'"); *Bownman v. U.S. Dep't of Agric.*, 363 F.2d 81, 85 (5th Cir. 1966)[4] (construing the Packers and Stock Yard Act liberally). In particular, the Eleventh Circuit found that "anger, embarrassment, and emotional distress" are actual damages under the Fair Housing Act, another consumer statute. Accordingly, under RESPA, actual damages arguably include

---

[4] The Eleventh Circuit adopted as binding precedent all decisions handed down by the old Fifth Circuit before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

non-economic injuries like mental anguish or emotional distress, in addition to economic injuries.[5]

Here, the Woods have alleged that they incurred approximately $14,000 in interest charges from February 2013 to July 2014. However, they incurred these charges before they sent the August 27, 2014 QWR, and thus, they cannot be attributed to any resulting RESPA violation by Green Tree. They additionally allege that they incurred $28.25 per day in interest after August 27, 2014. The Woods would not have incurred these interest charges if Green Tree had applied the insurance proceeds to the Woods' account, which was potentially an appropriate correction. Green Tree later retroactively applied the insurance proceeds to the sums the Woods' owed, and these interest charges might have been removed. However, Green Tree only brought this issue up in its reply brief, and the Woods did not have an opportunity to respond. Thus, whether those charges were fully removed remains disputed.

Moreover, the Woods alleged that they suffered emotional distress and mental anguish. The Woods admitted that they did not draft the August 27, 2014 QWR, never saw it, did not have a copy, and had no knowledge of its existence.

---

[5] In an unpublished decision, the Eleventh Circuit has said that "plaintiffs arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering" in RESPA cases. *McLean v. GMAC Mortg. Corp.*, 398 Fed. Appx. 467, 471 (11th Cir. 2010).

Although they both testified in their depositions about suffering emotional distress, they did not mention the August 27, 2014 QWR. Rather, the Woods attributed their distress to their house burning and to the overall dispute with Green Tree about the mortgage. However, even though they had no knowledge of the August 27, 2014 QWR, their alleged emotional distress could have been reduced if Green Tree had made the corrections that the QWR requested. Thus, the best way to decide whether there is a causal link between the Woods' emotional distress and the alleged RESPA violation is through evidence at trial. Accordingly, a genuine issue of material fact exists as to the damages incurred as a result of the alleged RESPA violation.

### C.     Declaratory Judgment

Green Tree also asked the Court to declare that the Woods owe Green Tree money on the loan. The Woods do not dispute that they owe at least $12,110.63 on the loan principal. (Docs. 34 at ¶ 28 and 37 at p. 6). However, the parties have not submitted sufficient information regarding any interest payments, escrow payments, or other fees that the Woods owe. Moreover, the Woods could ultimately offset any amount they owe with possible damages. Accordingly, the Court will not, at this point, declare what the parties potentially owe each other beyond what is undisputed.

IV.     **CONCLUSION**

For the foregoing reasons, Green Tree's motion for summary judgment is DENIED as to the Woods' breach of contract and RESPA claims and GRANTED as to their other claims. A separate order consistent with this Memorandum of Opinion will be entered.

Done and Ordered this 18th day of May 2016.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
182185